**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

No. 24-1780

---

CBV, INC.,
Appellant

v.

CHANBOND, LLC; DEIRDRE LEANE; IPNAV, LLC

---

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1:21-cv-01456)
District Judge: Honorable Gregory B. Williams

---

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
May 19, 2025

---

Before: PHIPPS, CHUNG, and ROTH, *Circuit Judges*

(Filed: July 21, 2025)

---

OPINION[*]

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

PHIPPS, *Circuit Judge*.

In this dispute about the payment of proceeds from a patent infringement settlement, the original patent holder did not receive the full amount of compensation that it believed it was owed, and it sued the purchaser of the patents. After learning that the patent purchaser paid millions of dollars from the proceeds of the settlement to a consultant, the original patent holder attempted to add claims for unjust enrichment against that consultant. But the original patent holder made that request four months after the deadline for amending or supplementing pleadings, and the District Court denied that motion. Later, at summary judgment, and after the proceeds from the patent infringement settlement had been distributed, the District Court refused, on mootness grounds, to enter a declaratory judgment on the meaning of a clause in the patent purchase agreement that affected the compensation due to the original patent owner. In this appeal, the original patent holder disputes those two rulings. For the reasons below, we will affirm the judgment of the District Court.

## I. BACKGROUND

### A. The Roll Out of the Patent Farming Business

In early 2015, Deirdre Leane, a citizen of Ireland and lawful permanent resident of the United States domiciled in Texas, was the sole member of two limited liability companies. One of those, ChanBond, LLC, was created for the business of acquiring and enforcing patents – a practice referred to by some as 'patent farming'[1] or, more

[1] *See* Sean M. O'Connor, *The Damaging Myth of Patent Exhaustion*, 28 Tex. Intell. Prop. L.J. 443, 462 (2020) (describing, in a history of patent practice during the antebellum period, patent uses characterized by "both abusive, extortionist litigation and beneficial, proactive business dealings" as "patent farming").

pejoratively, 'patent trolling.'[2] The other, IPNAV, LLC, was created for the business of providing consulting services to patent farmers.

Around that same time, CBV, Inc., a Pennsylvania corporation with its principal place of business in Carlisle, Pennsylvania, had applied for multiple patents related to the delivery of high-speed data over cable systems. On April 9, 2015, with four of those patents granted and three pending, CBV sold its rights to that intellectual property, along with rights to other abandoned or expired patents, to ChanBond through a Patent Purchase Agreement.

In return for those patent rights, ChanBond was obligated to compensate CBV based on the 'Net Recoveries' received from the patents. The Patent Purchase Agreement entitled CBV to receive 100% of the first $1 million of Net Recoveries and 50% of all Net Recoveries thereafter. *See* Patent Purchase Agreement § 3.3.2 (App. 136). The agreement – which designated CBV as the 'Seller' and identified ChanBond as the 'Purchaser' – also defined 'Net Recoveries' as Gross Recoveries less several categories of costs and expenses:

> [T]he total aggregate Gross Recoveries less the total aggregate amount of costs and expenses incurred by or on behalf of Purchaser in connection with the monetization, enforcement and/or sale of the Assigned Patent Rights which are exclusively limited to: (a) the reasonable fees and expenses of litigation counsel; (b) the reasonable fees and expenses of licensing counsel[;] (c) the reasonable fees and expenses of any re-examination or other patent prosecution counsel; (d) reasonable expert fees, court costs, deposition costs and other reasonable costs and expenses related to the maintenance, prosecution, enforcement, and licensing of the Patents; and (e) the reasonable fees and expenses of any other advisors or agents . . . .

[2] *See* Mark P. Gergen, John M. Golden & Henry E. Smith, *The Supreme Court's Accidental Revolution? The Test for Permanent Injunctions*, 112 Colum. L. Rev. 203, 243–44 (2012) ("Defining the term 'patent troll' is difficult, but a lot of the concern centers around entities that sit back while others make costly investments based on an apparent absence of relevant patent rights, not knowing that the troll will assert a claim of infringement after designing around the troll's patent rights becomes much more expensive.").

*Id.* § 2.8 (App. 135). 'Gross Recoveries' was defined as "the Cash compensation received by Purchaser solely from payments made by a third party in consideration for the licensing, enforcement and/or sale of the Patents." *Id.* § 2.7 (App. 135).

The same subsection of the Patent Purchase Agreement also included a provision that gave CBV some degree of control over the costs and expenses that would be deducted from Gross Recoveries to yield Net Recoveries. Specifically, CBV had a right of prior approval for costs or expenses paid to affiliates or stakeholders of ChanBond:

> Notwithstanding the above, any cost or expense which is paid to an Affiliate of Purchaser or to a stakeholder of Purchaser shall require the prior approval of Seller, such approval to not be unreasonably withheld.

*Id.* § 2.8 (App. 135); *see also id.* § 2.1 (App. 134) (defining a "Person['s]" "*Affiliate*" as "any Entity . . . that controls, is controlled by or is under common control with such Person" and defining 'control' as "possession directly or indirectly of the power to direct or cause the direction of the management and policies of an Entity," or alternatively, an entity with greater than 50% "of the voting equity interests of an Entity").

The two LLCs owned by Leane then began working together to farm the patents acquired from CBV, with ChanBond contracting with IPNAV for consulting services regarding the patents. By the terms of the Advisory Services Agreement that they entered, IPNAV's compensation for those services was 22% of "any licensing fee, litigation settlement fee, payment of damages or other remedies . . . collected by or made available to [ChanBond] in respect of the IP Rights." Advisory Services Agreement § 5 (App. 153); *see also id.* § 1(a) (App. 152) (characterizing 'IP Rights' as "the intellectual property owned or controlled by the Company [ChanBond], including without limitation, the patents identified in Exhibit A" (presumably of the Patent Purchase Agreement, those being the patents and patent applications purchased from CBV)).

Because IPNAV's compensation was a percentage of the fees and other revenues generated from the patents, the amounts paid to IPNAV would reduce Net Recoveries, of which CBV was entitled to a percentage. *See* Patent Purchase Agreement § 2.8 (App. 135) (providing that Net Recoveries would equal Gross Recoveries subtracted by "costs and expenses incurred by" ChanBond, including "the reasonable fees and expenses of any other advisors or agents"); *id.* § 3.3.2 (App. 136) (stating CBV would receive "fifty percent (50%) of all Net Recoveries"). And although ChanBond and IPNAV were both owned by Leane, ChanBond did not seek or otherwise receive the prior approval of CBV to enter that agreement.

**B. Litigation on Several Fronts**

In September 2015, ChanBond began enforcing the patents. It initiated thirteen lawsuits in the District Court against eighteen parties, including providers of high-speed data services, such as Comcast Corporation, Cox Communications, Inc., and Time Warner Cable Inc., for infringing on the patents that ChanBond had purchased from CBV.

Shortly afterward, on October 27, 2015, Leane sold her interest in ChanBond to UnifiedOnline, Inc.,[3] a Delaware corporation that did not have its principal place of business in Pennsylvania.[4] After its sale to UnifiedOnline, ChanBond continued to use IPNAV for consulting services.

The patent infringement litigation was consolidated into a single case, and it progressed to discovery. In its written discovery responses, ChanBond did not mention or

[3] In return for transferring full ownership in ChanBond to UnifiedOnline, Leane received $5 million as well as 44,700,000 shares of UnifiedOnline common stock – roughly a 4.5% interest in the corporation.

[4] CBV alleges that UnifiedOnline's principal place of business is in Virginia, while Leane and IPNAV allege that it is in North Carolina.

produce the Advisory Services Agreement. The defendants in that case did, however, learn of the agreement – directly from Leane herself at her deposition on April 24, 2018.

Leane later believed that revealing that information for the first time in her deposition hindered ChanBond's likelihood of succeeding in its infringement case. And with its compensation dependent on ChanBond prevailing in that litigation, IPNAV attempted to unilaterally terminate the Advisory Services Agreement within a week of Leane's deposition, despite that agreement serving as the sole basis for the compensation due to IPNAV from the patent farming. According to Leane, she took that step only after ChanBond – which was then owned by UnifiedOnline and hence was not an affiliate of IPNAV for purposes of CBV's prior approval rights – had promised to enter into a renewal agreement that would restore IPNAV's 22% interest in the patent farming proceeds.

Over two years went by, however, without a renewal agreement, and on September 30, 2020, Leane and IPNAV initiated arbitration proceedings against ChanBond.

The underlying patent infringement case reached resolution before that arbitration was completed. After a trial on the infringement claims, but before the jury returned a verdict, ChanBond settled with the defendants for $125 million.

Because the arbitration was still ongoing, ChanBond could not determine how much of those proceeds it would owe to IPNAV. And with uncertainty as to the amount owed to IPNAV, ChanBond could not calculate Net Recoveries for purposes of compensating CBV. Nonetheless, ChanBond made an initial distribution of $10 million to CBV. CBV believed that it was owed much more – about $20.5 million more – but it nonetheless agreed to let ChanBond wait until the conclusion of its arbitration with Leane before completing the payment.

Meanwhile, in the arbitration proceedings, Leane and IPNAV sought $27.5 million, that is, 22% of the $125 million patent infringement settlement – the amount that would be owed under the Advisory Services Agreement, if it remained in effect. ChanBond and UnifiedOnline, however, asserted that they owed IPNAV nothing because without CBV's prior approval of the Advisory Services Agreement, that agreement was "a self-serving, specifically prohibited affiliate transaction in the first place." UnifiedOnline, Inc. & ChanBond, LLC's Answer to Deirdre Leane & IPNAV, LLC's Demand for Arbitration & Appl. for Temporary & Permanent Injunctive Relief 1–2 (App. 469–70).

Realizing that its compensation depended on the validity and applicability of the Advisory Services Agreement, CBV then invoked the diversity jurisdiction of the District Court to initiate this case against ChanBond for breach of contract. *See* 28 U.S.C. § 1332(a), (c); *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 202 (3d Cir. 2022) (explaining that the citizenship of a limited liability company is determined by the citizenship of its members). In addition to seeking damages, CBV's amended complaint requested specific performance, injunctive relief, and a declaratory judgment as to the meaning of its prior approval right. *See* 28 U.S.C. § 2201 ("In a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration . . . .").

While CBV's case was pending in the District Court, the arbitration panel issued a decision. It reasoned that IPNAV's attempt to terminate the Advisory Services Agreement was ineffective, and under the terms of that agreement, ChanBond owed IPNAV $27.5 million. With that decision and only about $38 million remaining from the patent infringement settlement, it became clear that ChanBond could not pay both IPNAV and

CBV what they thought they were owed: $38 million could not cover payments of $27.5 million to IPNAV and $20.5 million to CBV.

Eight days after the arbitration decision, CBV filed a motion for a preliminary injunction in this case to enjoin ChanBond from paying the arbitration award to IPNAV. The next day, IPNAV and Leane sought to intervene, and the District Court permitted their intervention. They then filed an answer with respect to CBV's claims as well as two counterclaims against CBV for unjust enrichment and a declaration as to the meaning of the prior approval clause in the Patent Purchase Agreement.[5] They also opposed CBV's motion for a preliminary injunction.

The District Court denied CBV's motion for a preliminary injunction. It concluded that CBV was not likely to succeed on the merits of its claim because the prior approval clause in the Patent Purchase Agreement did not "grant CBV an unfettered right of consent before ChanBond enter[ed] into any affiliate agreement." *CBV, Inc. v. ChanBond, LLC*, D.C. No. 1:21-cv-01456, slip op. at 11–12 (D. Del. Oct. 5, 2022), ECF No. 151 (App. 661–62). CBV did not appeal the denial of its motion for a preliminary injunction. *See* 28 U.S.C. § 1292(a). On November 29, 2022, the District Court issued a scheduling order that set January 6, 2023, as the deadline for amending or supplementing the pleadings. *See* Fed. R. Civ. P. 16(b).

[5] In their pleadings, IPNAV and Leane also included a crossclaim against ChanBond for confirmation of their arbitration award under the Federal Arbitration Act. ChanBond filed a counterclaim against them for a vacatur of the award. Those two arbitration-related claims were later dismissed without prejudice by an order of the District Court pursuant to Rule 41(a). *See* Fed. R. Civ. P. 41(a). The cross- and counter-pleadings were not amended by the filing deadline set forth in the District Court's Rule 16 scheduling order. *Id.* 16(b). Thus, the dismissal of those claims was final. *See Williams v. Tech Mahindra (Ams.) Inc.*, 70 F.4th 646, 650 (3d Cir. 2023) (recognizing that where, "[i]nstead of amending his pleading," a party "elect[s] to stand on" a pleading that is dismissed without prejudice, that decision "trigger[s] this Court's appellate jurisdiction" (first citing 28 U.S.C. § 1291; and then citing *Weber v. McGrogan*, 939 F.3d 232, 240 (3d Cir. 2019))).

Without an injunction preventing the payment of the arbitration award to IPNAV, ChanBond paid IPNAV $30 million – an agreed-upon amount that reflected the $27.5 million arbitration award plus attorney's fees and arbitration costs. After that, CBV settled the damages claims with ChanBond for $4 million in April 2023. Although that settlement left open CBV's requests for a declaratory judgment and specific performance against ChanBond, CBV promised to hold ChanBond harmless in connection with those claims; it wanted those claims to remain active only as a means of pursuing relief against IPNAV and Leane:

> CBV will not seek any monetary or other relief against ChanBond, and such claims shall remain only because CBV believes they are necessary to recover against the Leane Defendants. CBV will hold the ChanBond Releasees harmless in connection with any counts that remain.

CBV, Inc. & ChanBond, LLC Settlement Agreement & Release of Claims § 4.2 (App. 941).

Within a month of that settlement, CBV moved for leave to amend its operative complaint to add a claim against IPNAV and Leane for unjust enrichment. That motion, however, was filed after the January 6 deadline in the scheduling order for amending or supplementing the pleadings and two months before the scheduled trial date of July 17, 2023. *See* Fed. R. Civ. P. 16(b). CBV argued that there was the requisite good cause to allow amendment over four months after that deadline. *See id.* 16(b)(4). The District Court did not find good cause and denied that motion.

All parties except ChanBond then cross-moved for summary judgment. The District Court resolved those motions by ruling against all requests for relief. In particular, it

declined, on mootness grounds, to enter a declaratory judgment as to the meaning of the prior approval clause.[6]

Through a timely notice of appeal, CBV invoked this Court's jurisdiction. *See* 28 U.S.C. § 1291. It now argues that the District Court erred in two respects: by denying its motion to further amend its complaint to add the unjust enrichment claim against IPNAV and Leane, and by declining to enter a declaratory judgment on the meaning of the prior approval clause.

## II. DISCUSSION

### A. The Denial of CBV's Request to Add the Unjust Enrichment Claim Against IPNAV and Leane

CBV argues that the District Court erred by denying its request to add an unjust enrichment claim against IPNAV and Leane four months after the deadline set in the Rule 16 scheduling order. *See generally* Fed. R. Civ. P. 16(b)(3)(A) (requiring the issuance of a scheduling order that, among other things, "limit[s] the time to . . . amend the pleadings . . . and file motions"). But a Rule 16 scheduling order is binding on the parties and "may be modified only for good cause and with the [District Court]'s consent." Fed. R. Civ. P. 16(b)(4); *see also* 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1522.2 (3d ed. May 20, 2025 update) ("[A]ny scheduling order issued under Rule 16(b) and the timetable it establishes will be binding."). When challenged on appeal, the denial of such an order is reviewed for an abuse of discretion. *See E. Mins. & Chems. Co. v. Mahan*, 225 F.3d 330, 339–40 (3d Cir. 2000). Thus, to succeed, CBV must demonstrate both good cause for its request and an abuse of discretion by the District Court.

[6] As an alternative holding, the District Court ruled that the Patent Purchase Agreement did not require CBV's prior approval for the Advisory Services Agreement.

But here, because the unjust enrichment claim that CBV attempted to add arose after the commencement of the case,[7] CBV could have pursued it in a separate civil action. *Cf. Morgan v. Covington Township*, 648 F.3d 172, 178 (3d Cir. 2011) ("[*R*]*es judicata* does not bar claims that postdate the filing of the initial complaint . . . ."); Fed. R. Civ. P. 13(a)(1) (applying the compulsory counterclaim rule only to qualifying counterclaims that, "*at the time of* [*a pleading's*] *service*[,] . . . the pleader has against an opposing party" (emphasis added)). And thus, even if there were good cause to allow the addition of the unjust enrichment claim, it was still not an abuse of discretion for the District Court to deny that motion. *Cf. Mahan*, 225 F.3d at 340 (holding that a district court did not abuse its discretion in denying a "motion to amend [a plaintiff's] complaint six months after the amendment and joinder deadlines had expired"). Indeed, requests to supplement a pleading are not granted as liberally as requests for amendment. *See Lutter v. JNESO*, 86 F.4th 111, 125 n.13 ("The standards for amendment and supplementation are similar, but they do not conform exactly as more lenience is afforded to amendment."); *see also* 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1510 (3d ed. May 20, 2025 update) (suggesting that, among the "number of competing factors" that "courts balance . . . to determine whether a supplemental pleading would be appropriate," a court may weigh the "advantage gained by disposing of the entire controversy" against "the difficulty of trying the original and supplemental claims in one action"). And in light of the resulting disruption from adding a new claim at the time of CBV's motion, which was "only a few weeks before the scheduled trial," the District Court

[7] Although CBV styled its request as one to amend its complaint to add a claim for unjust enrichment against Leane and IPNAV, because the unjust enrichment claim was premised on events that occurred after the filing of the original complaint, it was functionally a request for leave to supplement, not amend, its pleading. *See Lutter v. JNESO*, 86 F.4th 111, 125 (3d Cir. 2023) ("[S]upplementation adds or alters allegations, claims, or prayers for relief in the complaint based on events that occurred *after* the initiation of the lawsuit.").

did not abuse its discretion by denying the motion. Order Den. Pl.'s Mot. to File 2d Am. Compl., *CBV, Inc. v. ChanBond, LLC*, D.C. No. 1:21-cv-01456 (D. Del. June 8, 2023), D.C. ECF No. 28 (App. 672).

**B. The Meaning of the Prior Approval Clause Is a Moot Inquiry.**

CBV also contends that the District Court erred in determining that a declaratory judgment on the meaning of the prior approval clause would be moot. But even supposing that CBV had standing earlier in the litigation for declaratory relief, three intervening events alter the redressability of that claim: the full distribution of IPNAV's entitlement to the proceeds from the patent infringement settlement; CBV's settlement of its claims against ChanBond related to the proceeds from the patent infringement settlement; and the denial of CBV's request to add an unjust enrichment claim against IPNAV and Leane. Together, those developments demonstrate that the requested declaratory judgment would not "provide conclusive resolution of a concrete controversy related to a prospective course of action," which is needed for a declaratory judgment to satisfy the redressability requirement for Article III standing. *Lutter*, 86 F.4th at 129; *see also Linda R.S. v. Richard D.*, 410 U.S. 614, 618 (1973) (holding that a plaintiff lacks standing where the "relationship between the alleged injury" and "the requested relief" would result only in a "speculative" benefit); *Gulden v. Exxon Mobil Corp.*, 119 F.4th 299, 305 (3d Cir. 2024) ("[T]he loss of one or more of th[e] [three] elements [of standing] during the pendency of the litigation, if established by the defendant, subjects the affected claims or requests for relief to potential dismissal on mootness grounds."). And without presently having Article III standing for its declaratory judgment claim, CBV can avoid mootness only if one of the recognized exceptions to mootness applies. But this case, which is not a class-action, does not involve voluntary cessation, *cf., e.g., FBI v. Fikre*, 601 U.S. 234, 241–42 (2024) (concluding that

removing a plaintiff from the No Fly List after he filed suit did not moot a case where the government failed to "demonstrat[e] that it cannot reasonably be expected" to place him on the list again in the future), nor is the requested declaratory judgment on the meaning of the prior approval clause an issue capable of repetition yet evading review, *cf., e.g., Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 545–47 (1976) (holding that a trial court's expired order preventing members of the press from publishing statements prejudicial to a high-profile defendant was capable of repetition, yet evading review, in the event he would need to be retried). Accordingly, the District Court did not err in denying the requested declaratory judgment on mootness grounds.[8]

**III. CONCLUSION**

The District Court did not abuse its discretion in denying CBV leave to file a supplemental complaint, and it rightly denied CBV's declaratory judgment claim as moot. Therefore, we will affirm the judgment of the District Court.

[8] CBV also challenges the District Court's conclusion that the Patent Purchase Agreement did not grant it a right of prior approval over the Advisory Services Agreement. As CBV's request for a declaratory judgment is moot, there are no grounds for addressing that argument.